**SHONAC CORPORATION, Plaintiff,**

v.

**AMKO INTERNATIONAL, INC., et al., Defendants,**

and

**Hyosung Corporation, et al., New Party Defendants.**

**No. C2–89–613.**

United States District Court, S.D. Ohio, E.D.

March 21, 1991.

Gary D. Greenwald, Schrim & Greenwald, Columbus, Ohio, for plaintiff.

Lawrence D. Walker, Taft, Stettinius & Hollister, Columbus, Ohio, for defendants.

OPINION AND ORDER

GRAHAM, District Judge.

This case involves the importation and sale of athletic shoes made in Korea. Plaintiff, Shonac Corporation ("Shonac"), asserts claims under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68; as well as claims under state statutory and common law. This matter is before the Court on the motion for summary judgment of defendant Hyosung Corporation ("Hyosung").

On December 6, 1990, the Court announced its decision to grant Hyosung's motion for summary judgment on all of Shonac's claims. What follows are the reasons for the Court's decision.

## I. FACTS

### A. *The Parties*

Shonac is an Ohio corporation engaged in the business of retailing and wholesaling discount shoes. Discount shoes include grade "B" and factory overrun shoes, as well as shoes purchased at distress sales. Shonac employees who were involved in the subject transactions are: Dan Kelly, Shonac's chief athletic footwear buyer; Richard Smith, Shonac's merchandise manager; Jim Lipps, merchandise manager for Shonac's FMS (wholesale) division; and Carol Cowart, Shonac's import/export manager.

Hyosung is a Korean corporation and the holder of a Korean export license. Under Korean law, goods can be exported from Korea only through the holder of such a license.

AMKO Corporation ("AMKO") is an Illinois corporation which acts as a purchasing agent with respect to shoes manufactured overseas. Kyu Eun Lee is the president and sole shareholder of AMKO.

Red Line Products, Inc. ("Red Line") is a New York corporation engaged in the importation and sale of hunting boots. Red Line was not directly involved in the subject transactions, but Shonac sought to hold Red Line vicariously liable for the actions of its former employee, Seon Tae Kim ("S. T. Kim").

### B. *The Subject Transactions*

In the fall of 1988, Shonac sent Kelly and Smith to Taiwan and Korea to buy athletic shoes. They were accompanied by Lee, who had had business dealings with Shonac since 1983. In preparation for the trip, Lee arranged for S. T. Kim to introduce Kelly and Smith to sellers of overrun, cancellation and "B" grade shoes in Pusan, Korea. These sellers are referred to as "jobbers."

Kelly, Smith and Lee arrived in Pusan, Korea on October 9, 1988. The three spent five days in Pusan, arranging for the purchase of some of the shoes which are the subject of this case. During at least part of their visit, S.T. Kim drove the three around Pusan to visit jobbers and inspect shoes for possible purchase. Some of the jobbers worked out of the basements of high rise apartment buildings or tents, while other sold their shoes from more conventional warehouses. S. T. Kim and Lee also arranged for jobbers to bring their samples to the hotel room where Kelly and Smith were staying.

Kelly and Smith transacted business with the jobbers through Lee, who acted as a translator. S.T. Kim, who does not speak English, did not converse with Kelly or Smith. According to Kelly, each time he was presented samples of branded shoes by a jobber, he would ask Lee whether the shoes were "originals" or genuine. Every time, Kelly says, Lee responded in effect that he would not want to "lose face" by being involved with counterfeit goods. Kelly maintains that when Lee indicated that the shoes were not counterfeit, Kelly assumed he also meant that the shoes did not infringe on anyone's trademark. However, both Kelly and Smith admit that they never discussed with Lee the issue of obtaining the permission of the trademark owners of any of the branded shoes that were purchased. The previous month, all Shonac buyers had received, read and signed a policy statement issued by the Schottenstein stores instructing the buyers to obtain proof of the trademark owner's

authorization before making any purchase. On at least one occasion, Kelly recognized that sample shoes presented by one of the jobbers were counterfeit, and therefore declined to purchase them.

Kelly and Smith ordered thousands of pairs of shoes from the jobbers, including athletic shoes bearing such brand names as L.A. Gear, Reebok, Pro Wings and others. Kelly again traveled to Pusan in late February, 1989. Jim Lipps accompanied Kelly on this second trip. The events of the second trip are essentially the same as those of the first trip in October, 1988.

Shonac purchased branded athletic shoes from the Pusan jobbers through AMKO from October, 1988 until June, 1989. In the summer and fall of 1989, Shonac began to receive complaints from various trademark owners, including Ocean Pacific, Inc., Hyde Athletic Industries, Inc., L. A. Gear, Inc., Dexter Shoe Company, Inc., Volume Shoe Corporation and Melville Corporation concerning Shonac's unauthorized sale of these companies' branded shoes. The complaints apparently concerned shoes Shonac had purchased from the jobbers in Pusan. Ultimately, Shonac paid substantial sums in license or royalty fees to the trademark owners. Shonac sold most of the branded athletic shoes it bought from the Pusan jobbers, although some of the trademark owners required Shonac to sell certain shoes only in foreign countries. Shonac's remaining stock, consisting of Avia and Reebok shoes, was removed from the market altogether.

C. *The Structure of The Transactions*

The following describes how most of the sales took place. Kelly would write a purchase order to AMKO. The purchase order described the goods being purchased, and in the subject transactions specifically designated branded athletic shoes. Shonac stated in its purchase orders that it would pay for the goods with an "L.C." (letter of credit). In all of the documents prepared by Shonac, AMKO is listed as the seller of the shoes.

Usually that same day, Lee of AMKO would fill out a confirmatory pro forma invoice. The pro forma invoice specified the terms and conditions of the letter of credit. Lee submitted the pro forma invoice to Carol Cowart of Shonac.

Cowart used the information on the pro forma invoice to fill out an application for an irrevocable letter of credit which she then submitted to BancOhio National Bank ("BancOhio"). BancOhio then notified the advising bank, the Korean Exchange Bank in Seoul, Korea that an irrevocable letter of credit had been opened and informed the Korean bank of the terms of the letter of credit.

In most of the transactions, Hyosung, holder of a Korean export license, acted as the export window. Under Korean law, goods sold to an overseas customer must be processed through an export license holder. Export licenses are issued by the Korean department of Ministry and Trade, and very few factories have been able to obtain one. Hyosung is one of a relatively small number of registered trading companies currently operating in Korea.

With respect to Hyosung, the subject transactions were "indirect" export transactions. Shonac concedes that "[i]n an indirect export transaction, Hyosung has little if any contact with the customer, but instead acts as a middleman in purchasing the goods in Korea at the direction of another and reselling and exporting said goods to the customers." Shonac's memorandum contra, p. 5. Thus, even under Shonac's characterization, Hyosung's role was no more than that of a middleman or a conduit for the goods. In each transaction, the real seller was the jobber, and the real buyer was Shonac.

Either AMKO or S.T. Kim arranged for the services of Hyosung. In the transactions in which Hyosung was involved, it did no more than process documents necessary to obtain payment under the letters of credit. Hyosung did not undertake, or agree to undertake an inspection of the shoes. Indeed, there is no evidence that Hyosung even knew that the shoes were branded.

Pursuant to the terms of the letters of credit, Hyosung sent the various doc-

uments it prepared to BancOhio. The documents were sent by private courier. After making payment to Hyosung on the letters of credit, BancOhio would send the documents to Shonac by U.S. Mail. The documents prepared by Hyosung did not contain any representations concerning the genuineness of the shoes or that the sale of the shoes did not violate trademark law. Kelly, Smith and Lipps have all admitted that they were not even aware prior to this litigation that Hyosung was involved in the subject transactions. Only Cowart, who received the documents from BancOhio, knew of Hyosung. There is no evidence that Cowart or anyone else at Shonac ever relied on Hyosung to inspect the shoes to determine the genuineness of the shoes or to obtain the trademark owners' permission to sell the shoes.

The terms of the letters of credit, which were dictated by Lee of AMKO, required the issuance of an inspection certificate. Prior to export, the shoes were inspected by S.T. Kim. The inspection consisted of counting the number of pairs of shoes for an order. S.T. Kim would then execute an inspection certificate indicating the number of pairs of shoes, the purchase order number and the number of the letter of credit. The inspection certificates issued by S.T. Kim did not contain any representations that the shoes were genuine or that the trademark owners' permission had been obtained for the sale of the shoes. In fact, the inspection certificates did not even indicate that the subject shoes were branded. There is no evidence that anyone at Shonac relied on any of the information contained in the inspection certificates. On more than one occasion, the inspection certificate filled out by S.T. Kim was a Red Line form. Other inspection certificates used by S.T. Kim were AMKO forms. The inspection certificates were delivered to Hyosung, and Hyosung included them in the documents it delivered to BancOhio.

Shonac handled all of the details concerning the shipment of the shoes. Cowart arranged for goods to be shipped by Cargo Management Services. Cargo Management took possession of the shoes on Sho-nac's behalf in Pusan and delivered them to Shonac in Columbus, Ohio.

## II. STANDARD FOR SUMMARY JUDGMENT

The procedure for granting summary judgment is found in Fed.R.Civ.P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex* and *Matsushita* effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479. In addition, in responding to a summary judgment motion,

the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2515). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. *Id.* It is also not sufficient for the nonmoving party to merely " 'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

## III. DISCUSSION

### A. *Lanham Act*

#### 1. Background and History of Lanham Act § 43(a)

In Count One of its third amended complaint, Shonac asserts a claim under § 43(a) of the Lanham Act of 1946, 15 U.S.C. § 1125(a).[1] Section 43(a) states as follows:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowl-

edge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

The issues presented in this case require the Court to construe this section of the Lanham Act. In order to provide a context for this decision, the Court will first discuss the purpose and background of § 43(a). Based on the following, the Court has concluded that § 43(a) was drafted to address certain types of unfair competition; specifically, false designations of geographic origin and false descriptions or representations, including false advertising.

Section 43(a) is only one of many sections included in the Lanham Act of 1946, 15 U.S.C. §§ 1051–1127. The Lanham Act is a comprehensive federal act covering trademark law, which is a subcategory of unfair competition law. In this sense, § 43(a) is somewhat of an anomaly within the Lanham Act, inasmuch as it does not specifically address trademarks, but other aspects of unfair competition.

The Act was named after Fritz Garland Lanham, who served as a representative in Congress from 1919 to 1947. McCarthy, § 5:4 at 139. The Lanham Act was introduced in Congress in 1938, but was not enacted until July 5, 1946. It became effective on July 5, 1947.

Although the legislative history of the Lanham Act is fairly extensive, the history

---

**1.** The Lanham Act, including § 43(a), was amended by the Trademark Law Revision Act of 1988, effective November 16, 1989, after the conduct in question in this case had occurred and after the filing of this action. There is no indication that Congress intended the 1988 amendment to be applied retroactively. *Alpo Pet Foods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 963–64 n. 6 (D.C.Cir.1990) (pre–1988 version of 15 U.S.C. § 1125(a) applied in a similar case where the conduct and the filing of the

case occurred prior to the effective date of the amendment). *See also Bowen v. Georgetown Hospital,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). In their memoranda, both Shonac and Hyosung quote the full text of the pre–1988 version of § 43(a). In these circumstances, the Court concludes that the pre–1988 version of § 43(a) is applicable in the instant case. The Court will refer to the pre–1988 version simply as "§ 43(a)" and the amended version as the "1988 amendment."

of § 43 is very limited, and "[c]ongressional hearings and committee reports contain little which would add to the understanding of the specific scope or purpose of Section 43(a)." Bauer, *A Federal Law of Unfair Competition: What should Be The Reach of § 43(a) of the Lanham Act?*, 31 UCLA L.Rev. 671, 680 (1984); *accord Colligan v. Activities Club of New York, Ltd.*, 442 F.2d 686, 689–90 (2d Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). One reason for the dearth of informative legislative history on § 43 might be that at the time the Lanham Act was enacted, the importance of § 43(a) was perceived as minor. McCarthy, § 27:2 at 342.

The purposes of the Lanham Act are set forth in § 45, 15 U.S.C. § 1127. When the language referring to trademarks is removed from § 45, the purpose of § 43(a) is revealed to be "to protect persons engaged in ... commerce against unfair competition." 15 U.S.C. § 1127; *Halicki v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir.1987); *Colligan*, 442 F.2d at 691; *see also W.S.M., Inc. v. Hilton*, 724 F.2d 1320, 1331 (8th Cir.1984).

A noted scholar on the subject has stated that § 43(a) "never was intended to be a catch-all for all forms of unfair competition which may involve some kind of false or unfair allegations." Derrenberg, *Federal Unfair Competition Law at the End of the First Decade of the Lanham Act: Prologue or Epilogue?*, 32 N.Y.U.L.Rev. 1029, 1039 (1957) (hereinafter "Derrenberg"). Rather, "the primary and most important purpose of section 43(a) was to provide a private remedy in cases of false advertising." *Id.*

Additional insight into § 43(a) can be gained by examining its immediate predecessor, § 3 of the Act of March 19, 1920:

That any person who shall willfully and with intent to deceive, affix, apply, or annex, or use in connection with any article or articles of merchandise, or any container or containers of the same, a false designation of origin, including words or other symbols, tending to falsely identify the origin of the merchandise, and shall then cause such merchandise to enter into interstate or foreign commerce, and any person who shall knowingly cause or procure the same to be transported in interstate or foreign commerce or commerce with Indian tribes, or shall knowingly deliver the same to any carrier to be so transported, shall be liable to an action at law for damages and to an action in equity for an injunction, at the suit of any person, firm, or corporation doing business in the locality falsely indicated as that of origin, or in the region in which said locality is situated, or at the suit of any association of such persons, firms, or corporations.

Section 3 was enacted pursuant to the United States' obligations under the Buenos Aires Convention of 1910, which required the signatory countries to provide a remedy for the false designation of geographic origin. *See* Derrenberg at 1033. It is notable that the language of § 3 is in many respects similar to the language of § 43(a) of the Lanham Act. The use of the term "any person" to describe potential plaintiffs effectively overruled previous caselaw that had held that in order to have a cause of action for common law unfair competition, a plaintiff had to show that it had an exclusive ownership or property right in the trademark, trade name or style of goods that was the subject of the case. *See e.g., New York & Rosendale Cement Co. v. Coplay Cement Co.*, 44 F. 277, 279 (C.C.E. D.Pa.1890) (relief denied in action brought by cement manufacturers located in Rosendale, New York against Pennsylvania cement manufacturer that had marketed its cement using the name "Rosendale"); *see also American Washboard Co. v. Saginaw Manufacturing Co.*, 103 F. 281 (6th Cir. 1900) (relief denied in action brought by manufacturer of aluminum-covered washboards against manufacturer of zinc-covered washboards that had marketed them using the name "Aluminum"); *but see Pillsbury–Washburn Flour Mills Co. v. Eagle*, 86 F. 608 (7th Cir.1898), *cert. denied*, 173 U.S. 703, 19 S.Ct. 884, 43 L.Ed. 1184 (1899) (relief granted in action brought by flour mills located in Minneapolis, Minnesota against operator of a flour mill located in Wisconsin that sold its

flour in sacks and barrels marked "Minneapolis, Minnesota").

Section 3 of the Act of March 19, 1920, unlike § 43(a), was limited to cases of false designation of geographic origin. Furthermore, § 3 required the plaintiff to prove that the defendant acted "willfully and with intent to deceive," and for this reason, actions brought under § 3 did not often result in relief for plaintiffs. *See* Derrenberg at 1035; *Parfumerie Roger et Gallet Societe Anonyme v. Godet, Inc.*, 17 Trade–Mark Rep. 1, 2 (S.D.N.Y.1926). Significantly, the first portion of § 43(a), which refers to persons who "affix, apply, or annex, or use" a false designation of origin or false description or representation, does not require a plaintiff to prove that the defendant acted willfully and with intent to deceive. In fact, the first part of § 43(a) contains no scienter requirement whatsoever. The Court notes, however, that under the second part of § 43(a), in order to hold liable persons who "cause or procure the [goods] to be transported or used in commerce or deliver the same to any carrier to be transported or used," a plaintiff must prove that the person acted "with knowledge of the falsity." Thus, the second portion of § 43(a) retains the scienter requirement of § 3 of the Act of March 19, 1920.

The subsequent history of § 43(a) provides additional context for this Court's interpretation. The first important decision construing § 43(a) was *L'Aiglon Apparel v. Lana Lobell, Inc.*, 214 F.2d 649 (3d Cir.1954). The court in *L'Aiglon* held that the plaintiff, a dress manufacturer, had standing to assert a claim under § 43(a) against a defendant who had used a photograph of one of the plaintiff's dresses to advertise its own dresses, which were less expensive and of inferior quality. Significantly, the court in *L'Aiglon* rejected the defendant's argument that § 43(a) should be construed according to the former, more restrictive federal common law cases such as *American Washboard*. 214 F.2d at 651. *L'Aiglon* is frequently cited in later cases for the proposition that § 43(a) was created to protect "a broad class of suitors." *Id.*

Another significant case interpreting § 43(a) is *Federal–Mogul–Bower Bearings, Inc. v. Azoff*, 313 F.2d 405 (6th Cir.1963). Prior to *Azoff*, "false designation of origin" was believed to apply only to false advertising of geographic origin. McCarthy, § 27:3 at 345. The court in *Azoff*, however, interpreted "false designation of origin" to include the "origin of source or manufacture." 313 F.2d at 408. Under this principle, § 43(a) has been construed to apply not only to false advertising, but also to "infringement of an unregistered mark, name or trade dress." McCarthy, § 27:3 at 345.

A rapid expansion of § 43(a) litigation began in the 1970s, and continued through the 1980s. McCarthy, § 27:2 at 344. Section 43(a) has been held applicable to a wide variety of circumstances, ranging from more traditional trademark infringement, *see, e.g. Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154 (1st Cir.1977) to the enforcement of the "moral rights" of an artist in the integrity of his artwork, *see Gilliam v. American Broadcasting Companies*, 538 F.2d 14 (2d Cir.1976). *See generally* Germaine, *Unfair Trade Practices Under § 43(a) of the Lanham Act: You've Come A Long Way, Baby—Too Far Maybe?*, 49 Ind.L.J. 84 (1973).

As was previously noted, 15 U.S.C. § 1125(a) was amended on November 16, 1988, and some insight into § 43(a) may be gained by examining the legislative history of the 1988 amendment. The Senate Report on the amendment of § 43(a) indicates that the pre–1988 version of § 43(a) addressed only false descriptions or representations and false designations of geographic origin. S.Rep. No. 515, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. & Admin.News 5577, 5603–04. The report observes, however, that courts have interpreted § 43(a) as creating a federal law of unfair competition, providing relief in cases involving, for example, infringement of unregistered marks and false advertising. *Id.* It is notable that in spite of an attempt to include language expressly extending standing under § 43(a) to consumers, the existing language of the pre–1988 version relating to standing was adopted virtually verbatim in the 1988 amendment. *See Id.*

The committee also expressed its intention that standing under § 43(a) "should continue to be decided on a case-by-case basis." *Id.*

Several principles may be derived from the foregoing. First, § 43(a) is an unfair competition statute. It was originally drafted to address false designations of geographic origin and false descriptions or representations. These concepts necessarily include false advertising. Congress intended § 43(a) to create a private civil cause of action for persons injured by these kinds of unfair competition. In doing so, Congress overruled prior caselaw that had restricted such actions. Congress did not, however, intend § 43(a) to encompass every conceivable type of unfair competition or unfair trade practice. Although § 43(a) is included within a trademark act, it is not, strictly speaking, a trademark statute.

> 2. Standing, The Scope of Protection and Consumer Confusion Under § 43(a)

Actions under § 43(a) are typically brought by business competitors who claim they have been injured by false advertising. *See Dovenmuehle v. Gilldorn Mortgage Midwest Corporation*, 871 F.2d 697, 699 (7th Cir.1989). Shonac, however, is not a typical § 43(a) plaintiff. The subject matter of this case is the sale of allegedly counterfeit or otherwise unauthorized trademarked athletic shoes. Shonac is not the holder of a registered or unregistered trademark, nor is it a licensee or an exclusive distributor in connection with any of the subject athletic shoe trademarks. Indeed, Shonac has no interest whatsoever in the trademarks that are the subject matter of this case. Moreover, although § 43(a) is an unfair competition statute, Shonac and Hyosung are not in competition, even indirectly. In fact, Shonac acknowledges the absence of competition, and suggests that because it is suing under § 43(a) as a noncompetitor, it is not required to demonstrate actual consumer confusion to recover damages. Shonac's memorandum contra, p. 30. In essence, Shonac, as the wholesale purchaser of the allegedly counterfeit shoes, seeks to recover damages under § 43(a) from Hyosung on the basis that Hyosung was a link in the chain of persons involved in the transactions through which Shonac purchased the shoes. As Shonac's attorney expressed at a pretrial conference, Shonac seeks to impose liability under § 43(a) by "suing down the chain" to recover losses it incurred as a result of royalties and license fees paid to the trademark owners, much as one would sue down the chain to recover a payment made on a forged check.

Three interrelated issues are presented in this case: (1) whether Shonac has standing to sue under § 43(a); (2) whether and to what extent competition is required to maintain a suit under § 43(a); and (3) whether Shonac is required to demonstrate consumer confusion.

#### (a) *Standing*

Section 43(a) describes a proper plaintiff as "any person who believes that he is or is likely to be damaged by the use of any such false description or representation." The language of the 1988 amendment is virtually identical in this respect.

The first important interpretation of the standing provision of § 43(a) occurred in *Colligan*, 442 F.2d at 693. The court in *Colligan* held that consumers lack standing under § 43(a). *Id.* The action in *Colligan* was brought by the parents of two parochial school children against an interstate ski tour service. The complaint generally averred that the parents had purchased the defendant's ski tour weekend for their children based upon representations contained in the defendant's fliers, which were deceptively similar to those of another well-known and reputable ski tour service. The children suffered numerous misfortunes on the ski trip, and it eventually became apparent that many of the representations made in the defendant's literature were false. The plaintiffs in *Colligan* sought injunctive relief and damages under § 43(a) of the Lanham Act. The district court dismissed the action for lack of jurisdiction. The court of appeals in *Colligan* concluded that it was necessary to deter-

mine whether the plaintiffs, who were consumers, had standing under § 43(a).

Not surprisingly, the plaintiffs in *Colligan* argued that the term "any person" was unambiguous and clearly provided consumers standing to sue. The court in *Colligan* rejected the plaintiffs' argument, quoting Judge Learned Hand's observation that " '[w]ords are not pebbles in alien juxtaposition.' " 442 F.2d at 689 (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941)). The *Colligan* court first considered the legislative history of § 43(a), only to discover that it provided no assistance for the determination of the meaning of "any person."

The court in *Colligan* next examined the purpose of the Lanham Act as set forth in § 45, 15 U.S.C. § 1127. The court focused on the following language:

> The intent of this chapter ... is to protect persons engaged in such commerce against unfair competition.

442 F.2d at 691 (quoting 15 U.S.C. § 1127). The *Colligan* court noted that the above-quoted language contains the only reference in § 45 to the class of persons to be protected by the Act. *Id.* The court also observed that no mention was made of consumers or of the general public. *Id.* Based upon this observation, as well as the conclusion that allowing consumers standing under § 43(a) would result in a flood of litigation, the court in *Colligan* held that consumers lack standing to sue under § 43(a). *Id.* at 693.

The next significant development concerning standing under § 43(a) was the adoption by the courts of the "reasonable interest" test. The first reported decision to apply the reasonable interest test was *Rare Earth, Inc. v. Hoorelbeke*, 401 F.Supp. 26 (S.D.N.Y.1975). The court in *Rare Earth* reasoned that a plaintiff must possess "a sufficient nexus with the alleged wrongful conduct" in order to have standing under § 43(a). 401 F.Supp. at 39. At the same time, however, the *Rare Earth* court acknowledged that § 43(a) "envisions a broad class of suitors." *Id.* Seeking to accommodate both concepts, the court in *Rare Earth* adopted a test for

standing suggested by the treatise of I.R. Callmann, *Unfair Competition, Trademarks and Monopolies*, § 18.2(b) at 625 (3d ed.1967):

> The dispositive question should be whether a [litigant] has a reasonable interest to be protected against false advertising.

401 F.Supp. at 39. The *Rare Earth* court held that the party asserting the claim under § 43(a) had standing because the parties were competitors in the rock music industry. *Id.* Since *Rare Earth*, not fewer than five federal circuits have adopted the reasonable interest test. *See Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697, 700 (7th Cir.1989); *Thorn v. Reliance Van Company, Inc.*, 736 F.2d 929, 933 (3d Cir.1984); *Smith v. Montoro*, 648 F.2d 602, 608 (9th Cir.1981); *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980); *Quabaug Rubber Company v. Fabiano Shoe Company, Inc.*, 567 F.2d 154, 160 (1st Cir. 1977). In the instant case, Shonac asserts that the reasonable interest test is the proper standard to apply to determine standing. Shonac's memorandum contra, p. 16. This Court believes that the Sixth Circuit would likely adopt the reasonable interest test, in some form. Of course, what constitutes a "reasonable interest" is subject to some interpretation, and the determination of standing under § 43(a) under this or any other test will undoubtedly have to be made on a case by case basis.

Shonac relies most heavily upon *Thorn* and *Smith*, ostensibly the most liberal decisions on the issue of standing, in arguing that it has a reasonable interest to be protected under § 43(a). In *Thorn*, the plaintiff was a director and a forty-five percent shareholder of a trucking company that later went bankrupt. The plaintiff brought an action against one of the bankrupt trucking company's competitors, claiming that the competitor had engaged in false advertising, and that the false advertising led to economic injury and ultimately to the bankruptcy of the company in which the plaintiff had invested. Applying the reasonable interest test, the court in *Thorn* found that although the plaintiff was not a

competitor, "in his capacity as an investor [he] has alleged sufficient direct injury resulting from the false advertisements of the defendants and through these allegations has demonstrated a reasonable interest to be protected under § 43(a)." 736 F.2d at 933. In dicta, the court in *Thorn* rejected the *Colligan* court's conclusion that consumers may not bring an action under § 43(a). *Id.* at 932. However, the court in *Thorn* distinguished *Colligan* on the basis that the plaintiff was not a consumer, but an investor.

At first blush, *Thorn* may appear to represent a significant departure from the typical § 43(a) case with respect to standing. A closer examination, however, reveals that *Thorn* is neither revolutionary nor analogous to the instant case. First, *Thorn* involved the classic conduct that § 43(a) was designed to remedy: false advertising. In *Thorn*, there was a palpable nexus between the plaintiff and the bankrupt company that was directly damaged by the unfair competition. In effect, the plaintiff in *Thorn* stood in the shoes of the bankrupt company because of his status as an investor. In the instant case, in contrast, there is no similar discernible nexus between Shonac and the persons who actually have a reasonable interest to be protected under the Lanham Act, namely, the trademark owners. Thus, *Thorn* is not supportive of Shonac's argument that it has a reasonable interest to be protected under § 43(a).

The other case upon which Shonac principally relies is *Smith v. Montoro*, 648 F.2d 602 (1981). The plaintiff in *Smith* was an actor who had contracted to star in a film made by an Italian film company. The contract provided that the plaintiff would receive star billing in the film's screen credits, as well as in advertisements for the film, and that the film company would require these conditions in any later contracts with distributors of the film. After the film was made, the film company then licensed another company to distribute the film. However, the distributor removed the plaintiff's name from the film credits and advertising materials and substituted the name of another actor. The plaintiff in

*Smith* argued that the substitution damaged his reputation as an actor and resulted in the loss of specific employment opportunities.

The district court in *Smith* held that the plaintiff did not have standing to sue under § 43(a) because he was not in competition with the defendants, and he was not a member of a "purely economic class." 648 F.2d at 607. The court of appeals reversed, holding that the plaintiff's vital interest as an actor in receiving accurate credit for his work satisfied the reasonable interest test. *Id.* at 608.

*Smith* is also readily distinguishable from the instant case. As an actor, the plaintiff in *Smith* had an obvious interest in protecting the use of his image in the film. His image was, in effect, his product, and the credits in the film and advertising constituted, in essence, the label for his product. In this sense, *Smith* is unusual only because of the subject matter of the case: the mislabelling of an actor's image is really no different than the mislabelling of a sack of flour or any other type of product and represents a kind of "reverse palming-off." 648 F.2d at 602.

In *Smith*, unlike the instant case, the plaintiff had a direct interest in the product for which protection under the Act was sought. Here, Shonac does not have any interest whatsoever in the athletic shoe trademarks that are the subject of this case. Therefore, *Smith* does not support Shonac's argument that it has standing under § 43(a).

On the issue of standing, this Court finds more instructive the reasoning and result reached in *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 871 F.2d 697 (7th Cir.1989). In *Dovenmuehle*, the plaintiffs were members of a family challenging the use of the family name as a trade-name. The family company, bearing the family's name, had been sold in its entirety in 1923. The company's assets were subsequently sold several times, and in 1987 the purchaser of the company's assets expended substantial sums to change its name to the family name. The plaintiffs in *Doven-*

*muehle* had no interest in the family company, and were not engaged in the company's business, namely, mortgage banking. After surveying the law of the other circuits on this issue, including *Colligan, Smith* and *Thorn,* the court in *Dovenmuehle* concluded that the plaintiffs lacked standing under § 43(a). 871 F.2d at 700–01. The court in *Dovenmuehle* initially noted that "[n]one of the plaintiffs are engaged in competition, even indirectly, with the defendants." *Id.* at 700. The court also stated that "given that [the plaintiffs] have no interest in the trade name 'Dovenmuehle' and are not even arguably engaged in commercial activities, the district court correctly dismissed their claims for lack of standing." *Id.* at 701.

■ Of course, unlike the plaintiffs in *Dovenmuehle,* Shonac is engaged in commercial activity. However, like the plaintiffs in *Dovenmuehle,* Shonac has no interest whatsoever in the trademarks which are the subject matter of the instant case. This Court agrees with the implicit holding of *Dovenmuehle,* that a plaintiff who has no interest in the trade name sought to be protected cannot have standing. This rule is consistent with the reasonable interest test as well as the language of § 43(a). By limiting standing under § 43(a) to plaintiffs who have at least some interest in the name, symbol, product or service for which protection is sought under the Act, the rule in *Dovenmuehle* reasonably defines those who may properly be deemed "likely to be damaged." This requirement, or refinement of what "reasonable interest" means, is consistent with broadly construing § 43(a) as a remedial statute. To meet the requirement, the interest asserted would not need to be an exclusive interest, or even necessarily an ownership interest. Thus, the interests of a trustee or the holder of other equitable interests, or even a trade association would meet the requirement. The requirement would not be met, however, where the interest is extremely remote, or, as in the instant case, completely absent. Of course, a plaintiff need not be a trademark owner to assert a claim under § 43(a). At the same time, however, if, as here, the subject matter of a case is a

trademark, then the plaintiff must have some discernible interest in the mark in order to have a reasonable interest and therefore standing to sue under § 43(a). Because Shonac has no interest whatsoever in the trademarks that are the subject matter of this case, it lacks standing to sue under § 43(a).

### (b) *The Competition Requirement*

■ Another issue presented in this case is whether and to what extent competition is necessary to maintain a claim under § 43(a). The courts are divided on this issue. The Ninth Circuit has held that in order to be actionable under § 43(a), conduct "must in some discernible way be competitive." *Halicki v. United Artists Communications, Inc.,* 812 F.2d 1213, 1214 (9th Cir.1987). The Second Circuit, on the other hand, has adopted the position that § 43(a) does not require competitive injury. *Spring Mills, Inc. v. Ultracashmere, Ltd.,* 689 F.2d 1127, 1136 n. 13 (2d Cir.1982). The First Circuit Court of Appeals has also made the statement that "there appears to be a general consensus that the plaintiff does not have to be a competitor in order to have standing to sue." *Camel Hair and Cashmere v. Associated Dry Goods,* 799 F.2d 6, 11 (1st Cir. 1986); *see also* McCarthy, § 24:4 at 173–74. Given the holding in *Thorn,* it appears the Third Circuit also does not require competition. This Court will first examine the Ninth's Circuit position, as set forth in *Halicki.*

In *Halicki,* the plaintiff, a movie producer, brought an action under § 43(a) against United Artists Communications, Inc. and various theaters, asserting that the defendants were advertising the plaintiff's PG rated film as R rated. The plaintiff in *Halicki* argued that relief under § 43(a) was available on the basis of the trend to expand the coverage of the Lanham Act. The district court dismissed the plaintiff's complaint. The court of appeals affirmed, holding that relief was not available under § 43(a) because the plaintiff was not a competitor. 812 F.2d at 1214–15. As in *Colligan,* the decision in *Halicki* rested in large

part upon the court's determination that the purpose of § 43(a) is set forth in § 45 of the Lanham Act, 15 U.S.C. § 1127:

> The final section of the Lanham Act—in a passage unusual, and extraordinarily helpful, in declaring in so many words the intent of Congress—states that "the intent of this chapter is to regulate commerce within the control of Congress ... to protect persons engaged in such commerce against unfair competition." We quote the operative language. The rest of the declaration of intent relates to the use of trademarks and is not relevant here. The statute is directed against unfair competition. To be actionable, conduct must not only be unfair, but must in some discernible way be competitive.

812 F.2d at 1214 (quoting 15 U.S.C. § 1127). The court in *Halicki* rejected as "Pickwickian" the plaintiff's argument that the term "unfair competition" should be interpreted as not requiring competition. *Id.* (criticizing McCarthy, § 24:4 at 173–74). The court in *Halicki* further stated:

> If § 43(a) is not confined to injury to a competitor in the case of false designation, it becomes a federal statute creating the tort of misrepresentation, actionable as to any goods or services in commerce affected by the misrepresentation. As one treatise suggests, the Lanham Act then would be similar to French, German and Swiss law, where, by virtue of the general code clause, in any suit in tort or contract the violation of good morals may become an issue. Broadening the Act from unfair competition to unfair trade "is equivalent" to the complete dilution of the concept of unfair competition.

*Id.* (citing Callmann, *Unfair Competition, Trademarks and Monopolies* (1981 ed., 1986 supp.) § 209). To grant standing to a noncompetitor would, according to the court in *Halicki* "mutilate a federal statute and frustrate express Congressional intent." *Id.* at 1215.

It is interesting that *Halicki* was decided by the same circuit, albeit by a different panel, as *Smith v. Montoro, supra.* The court in *Halicki* discusses *Smith* and ac-

knowledges that the plaintiff in *Smith* was not a competitor. Although *Halicki* does not purport to overrule *Smith,* it can only logically be viewed as a significant retreat from the more liberal approach to standing taken by *Smith,* unless the Ninth Circuit is making an exception to the competition requirement in cases involving reverse palming-off. The Ninth Circuit reaffirmed the competition requirement in *Lamothe v. Atlantic Recording Corp.,* 847 F.2d 1403, 1406 (9th Cir.1988), citing *Halicki.* Interestingly, *Lamothe* also cites *Smith,* with apparent approval, although not on the issue of standing.

It is also not clear whether *Halicki* viewed the competition requirement as relating to standing or to an element of the plaintiff's substantive claim. On one hand, the court in *Halicki* discussed *Smith* as relevant authority, and *Smith,* of course, addressed standing. On the other hand, the word "standing" does not appear in *Halicki.* In any event, given the procedural posture of this case, it matters little whether the requirement is "viewed as a matter of standing ... or as an element of the substantive claim for relief." *Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 189 (2d Cir.1980). Whether related to standing or the substantive case, if this Court follows the competition requirement as set forth in *Halicki,* Shonac's § 43(a) claim must be dismissed.

A very different approach is taken by the Second Circuit which has expressly held that § 43(a) does not require competitive injury. *Spring Mills, Inc. v. Ultracashmere, Ltd.,* 689 F.2d 1127, 1136 n. 13 (2d Cir.1982). The rule apparently has its genesis in *McGregor–Doniger v. Drizzle, Inc.,* 599 F.2d 1126 (2d Cir.1979). In *McGregor–Doniger,* the plaintiff, a trademark owner, manufactured and sold golf jackets under the trademark "Drizzler." The defendant marketed more expensive women's coats under the unregistered trademark "Drizzle." The plaintiff in *McGregor–Doniger* brought its action under Lanham Act §§ 32(1) and 43(a), as well as under state common law of unfair competition.

Without differentiating between the causes of action, the court in *McGregor–Doniger* analyzed the plaintiff's claims under the overarching concept of consumer confusion. One of the factors the court examined in addressing consumer confusion was the proximity or similarity of the goods. 599 F.2d at 1134–35. The court of appeals in *McGregor–Doniger* upheld the district court's finding that the competitive distance between the products was great because the defendant's coats were considerably more expensive than the plaintiff's golf jackets, and were significantly different in style. *Id.* Ultimately, the court of appeals affirmed the district court's dismissal of the plaintiff's complaint. Although *McGregor–Doniger* discussed noncompeting goods, it did not expressly purport to do so in connection with the requirements of § 43(a).

Significantly, *McGregor–Doniger* was cited by the court in *Spring Mills* for the proposition that "competitive injury is not required for recovery under section [43(a)]." 689 F.2d at 1130 n. 13. *Spring Mills* does not contain any further analysis or authority in support of this rule. Like *McGregor–Doniger*, *Spring Mills* involved an action by the owner of a registered trademark brought under §§ 32(1) and 43(a) of the Lanham Act. The parties in *Spring Mills* were not in direct competition: the plaintiff marketed imitation suede under the trademark "Ultrasueds," while the defendant manufactured women's clothes from a spun rayon fabric and marketed them under the label "Ultracashmere." In its original opinion, the district court in *Spring Mills* dismissed the plaintiff's § 43(a) claim for lack of standing because the parties were not in competition.

The court of appeals in *Spring Mills* reversed, holding that the district court erred in determining that the marks Ultrasuede and Ultracashmere were not substantially similar when viewed in context. 689 F.2d at 1136. The court of appeals also found erroneous the district court's conclusion that the defendants had not acted in bad faith in adopting the plaintiff's mark and trade dress. Upon remand, the district

court failed to consider the plaintiff's § 43(a) claim in spite of the court of appeals' instruction in footnote 13. Partly for this reason, the court of appeals again reversed, reiterating that § 43(a) does not require competitive injury. *Springs Mill, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 357 (2d Cir.1983).

The Second Circuit's approach to the role of competition in § 43(a) cases stems from the concept that consumer confusion is the bottom line in trademark infringement and false advertising cases, whether they are brought under § 43(a), § 32(1), or state common law of unfair competition. *See Spring Mills*, 689 F.2d at 1129; *American Footwear Corp. v. General Footwear Corp.*, 609 F.2d 655, 664 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Under this approach, competition is not irrelevant, but it is not dispositive. Rather, it is taken into consideration via the "proximity of the products" factor.

This Court is not faced with the dilemma of choosing between the two positions because, as will be demonstrated by the following discussion, under either approach, Shonac's § 43(a) claim fails as a matter of law. The Court does, however, find the Ninth's Circuit's approach as set forth in *Halicki* to be highly persuasive. " 'There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes.' " *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982) (quoting *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940)). Here, there is no more persuasive evidence of the purpose of § 43(a) than Congress' unambiguous statement that it is meant to "protect persons engaged in ... commerce against unfair competition." Lanham Act § 45, 15 U.S.C. § 1127. This Court also agrees with the conclusion of the court in *Halicki* that any attempt to interpret the term "unfair competition" as not requiring any competition whatsoever would be "Pickwickian" and certainly not

934

consistent with the plain meaning of the statute. If Congress had intended § 43(a) to apply to noncompetitive conduct, it would have stated that the purpose of the statute was to protect persons engaged in commerce from unfair trade or unfair business practices.

*Halicki* requires that competition be present in some discernible way. Whether viewed as a requirement for standing or as a substantive element, the application of this principle to the instant case requires the dismissal of Shonac's § 43(a) claim. It is beyond dispute that Shonac is not in competition with Hyosung in any discernible way.

### (c) *Consumer Confusion*

■ Even if this Court were to follow the approach formulated by the Second Circuit, however, Shonac's § 43(a) claim would still fail. Under the Second Circuit's approach, consumer confusion is "the central inquiry in all cases of alleged trademark infringement and unfair competition." *Spring Mills*, 689 F.2d at 1129. Stated otherwise:

> The test, under both the Lanham Act and common law, is the likelihood that the consuming public will be confused as to the source of the allegedly infringing product.

*American Footwear*, 609 F.2d at 664 (noting that same test applies to claims of trademark infringement and unfair competition); *see also* McCarthy, § 23:1 at 44 ("[T]he test of likelihood of confusion is the touchstone of trademark infringement as well as unfair competition."). The Sixth Circuit Court of Appeals has similarly held that the standard of proof applicable to § 43(a) actions requesting injunctive relief is a showing of the likelihood of consumer confusion. *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 647 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). The standard of proof required to recover damages under § 43(a) is higher. *See McCarthy*, § 27:5a at 360. Indeed, a plaintiff must show actual consumer confusion, as opposed to the mere likelihood of consumer confusion, in order to recover monetary damages under

§ 43(a). *PPX Enterprises v. Audiofidelity Enterprises*, 818 F.2d 266, 271 (2d Cir. 1987).

■ Oddly enough, in the instant case Shonac argues that it does not need to demonstrate consumer confusion precisely because it is not a competitor. Shonac's memorandum contra, p. 30. Shonac cites no authority for this remarkable assertion. Ironically, one of the leading cases standing for the proposition that competition is not required under § 43(a), *Spring Mills*, also clearly stands for the proposition that consumer confusion is the central inquiry in any unfair competition case. 689 F.2d at 1129, 1136 n. 13. The Court rejects Shonac's argument that because it is a noncompetitor it is not required to demonstrate actual consumer confusion.

In the alternative, Shonac argues that it has presented evidence of consumer confusion because the shoes "may not have been inspected to insure that the trademark owner's quality standards were met" and because consumers may have been deceived into "believing that the domestic marketholder's good will stood behind the product." Shonac's memorandum contra, pp. 29, 30. At best, Shonac's assertions are speculative, and Shonac has produced no evidence of actual consumer confusion. Although Shonac does not raise the argument, it is also not sufficient that Shonac itself, as a purchaser and wholesaler, may have been confused. In this case, the relevant buyer class would consist of the ultimate consumers of the shoes: the purchasing public. *E.I. Dupont de Nemours & Co. v. Yoshida International, Inc.*, 393 F.Supp. 502, 513 (E.D.N.Y.1975); *McCarthy*, § 23:29A at 133–34. For these reasons, even if Shonac is not required to demonstrate competition, its § 43(a) claim nevertheless fails because it has failed to come forward with any evidence of actual consumer confusion.

In fact, this Court does not believe that it would be possible for Shonac to demonstrate that it was damaged by any alleged actual consumer confusion. If consumers had actually been confused as to the origin of the shoes, the persons who would have

suffered harm would have been the trademark owners, not Shonac. The only way Shonac could have been damaged by consumer confusion would have been if its customers, upon learning that the shoes were counterfeit, had complained about them or returned them demanding their money back. There is no evidence that this ever occurred. Shonac's inability to demonstrate consumer confusion further confirms the Court's conclusion that Shonac lacks standing to assert a claim against Hyosung under § 43(a).

Based on the foregoing discussion, the Court holds that Shonac lacks standing under § 43(a) because it does not have a reasonable interest in the trademarks that are the subject matter of this case. The Court further holds that Shonac's § 43(a) claim must be dismissed because Shonac is in no discernible way in competition with Hyosung, and because Shonac has failed to come forward with any evidence of actual consumer confusion.

3. The Element of Knowledge

Another issue presented in this case is whether Hyosung's conduct is actionable under § 43(a). Shonac in effect is seeking to hold Hyosung strictly liable for its role as an innocent conduit or middleman.

Although the parties have not thoroughly briefed the issue, the Court notes that the pre–1988 version of § 43(a) of the Lanham Act clearly refers to more than one type of actionable conduct. The first part of the statute refers to persons who "affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods to enter into commerce." 15 U.S.C. § 1125(a). This first part of § 43(a) does not contain a scienter requirement.

The second part of the statute refers to persons "who shall *with knowledge of the falsity* of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used." 15 U.S.C. § 1125(a) (emphasis added). Under the plain language of the second part of the statute, a defendant must have acted with knowledge of the falsity in order to be liable.

As remarkable as it may seem, after more than forty years of litigation under § 43(a), only a handful of cases have made even passing reference to the knowledge requirement of the second part of the statute. *See, e.g., Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1408 (9th Cir.1988); *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 648 n. 7 (3d Cir.1958); *Bowmar Instrument Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 957 (S.D.N.Y.1980). In *Lamothe*, the court held that licensees of music composers could be held liable under § 43(a) in a case involving an alleged incomplete designation of authorship with respect to certain songs. 847 F.2d at 1408. The court in *Lamothe* stated that some of the licensees might have been involved in the affixing of an incomplete designation of authorship, and that such licensees would be liable under § 43(a) even without proof of knowledge. *Id.* Without elaborating, the court opined that other licensees might be liable if they acted with knowledge of the falsity under the second part of § 43(a). *Id.*

The *Parkway* court merely made reference to the knowledge of falsity requirement of § 43(a), but concluded that it did not apply where the defendant, a baking company, had used a false description on the wrapper for its bread. 255 F.2d at 648 n. 7. In *Bowmar*, one of the defendants was a distributor who argued that it could not be held liable under § 43(a) because it "did not manufacture or assemble and therefore did not apply, affix or annex any false designation." 497 F.Supp. at 957. The court in *Bowmar* noted that the second part of § 43(a) "refers to a person who 'with knowledge of the falsity' causes goods to be transported in commerce." *Id.* (quoting 15 U.S.C. § 1125(a)). The *Bowmar* court did not give any reasons for its

conclusion that the distributor's conduct did not fall within the second part of § 43(a), other than to state that the distributor at some point had in its possession boxes and pamphlets that falsely bore the plaintiff's name, and that the distributor played a role greater than that of a mere retailer in the sale of the falsely-labelled goods. *Id.* None of the aforementioned decisions attempted to describe the kind of conduct for which proof of knowledge would be a requisite element. These cases do, however, confirm this Court's conclusion that in order to hold a defendant liable under the second part of § 43(a), the plaintiff must prove that the defendant acted with knowledge of the falsity.

Shonac argues that Hyosung's conduct falls within the first part of § 43(a) because its role in the indirect sales transaction constitutes a "use in connection with ... goods." 15 U.S.C. § 1125(a). *See* Shonac's memorandum contra, p. 20. In making this assertion, Shonac relies upon the following definition set forth in § 45 of the Lanham Act, 15 U.S.C. § 1127:

> For purposes of this Act, a mark shall be deemed *used in commerce* (a) on goods when it is placed in any manner on the goods or their containers ... and the goods are sold or transported in commerce.

*Id.* (emphasis added). Shonac's reliance on this section is misplaced. First, § 45 does not define "use," but "used in commerce." Significantly, the term "used in commerce" is used to describe the conduct actionable under the second part of § 43(a), which requires proof of knowledge of the falsity. Furthermore, the use of the term "mark" in the language quoted from § 45 leads this Court to believe that the definition is meant principally to apply to those sections of the Lanham Act which specifically address trademarks, rather than § 43(a). *See* 15 U.S.C. § 1114(1)(a).

■ Viewing the evidence in the light most favorable to Shonac, the Court finds that Hyosung did not "affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation." 15 U.S.C. § 1125(a). Shonac does not dispute that Hyosung did not "affix, apply, or annex" the trademarks to the shoes or their packaging, and there is no evidence whatsoever that Hyosung did so. Hyosung's conduct also does not constitute "use in connection with" the shoes or their packaging. There is no evidence that Hyosung used the trademarks in any way. Hyosung's role in the subject transactions was strictly that of an export window in an indirect sales transaction, and its participation was limited to the processing and preparation of standard commercial documents, none of which even mentioned the brand names of the subject shoes. In fact, there is no evidence that Hyosung even knew that the subject shoes were trademarked. In these circumstances, the Court concludes that Hyosung's conduct does not fall within the first part of § 43(a).

The Court also has some doubts as to whether Hyosung's conduct even rises to the level of that proscribed by the second part of § 43(a). Hyosung did not cause the goods to be shipped—Carol Cowart of Shonac performed that function through Shonac's agent, Cargo Management. Thus, Hyosung did not cause the shoes to be transported or delivered.

Assuming, however, that Hyosung's conduct falls within the second part of § 43(a), Shonac's claim fails because Shonac has not come forward with any evidence that Hyosung knew that the subject shoes were counterfeit or otherwise sold in violation of the trademark owners' rights. Indeed, there is no evidence that Hyosung knew that any of the shoes were branded.

Based on the foregoing, the Court concludes that Hyosung's conduct as a conduit or middleman is not actionable under § 43(a) under the facts of this case. Shonac's § 43(a) claim against Hyosung must therefore be dismissed.

### 4. The Unauthorized Sale of Genuine Goods

■ Although the previously discussed issues are dispositive, the Court will, for the sake of judicial economy, address an-

other issue raised by the parties: whether the unauthorized sale of otherwise genuine goods violates § 43(a) of the Lanham Act. This issue arises because Hyosung argues that Shonac has failed to prove that any of the subject athletic shoes are actually fake or counterfeit. Shonac has attempted to counter Hyosung's argument and create a factual issue by offering the affidavits of various persons associated with the trademark owners, as well as the deposition of Attorney Harley I. Lewin, a purported expert on trademark law and a representative of Reebok. The evidence Shonac offers is seriously flawed, however, chiefly because each of Shonac's potential witnesses has either failed affirmatively to state that the subject shoes are literally fake or counterfeit, or has failed to set forth any chain of possession to demonstrate that the shoes that were inspected were imported through Hyosung.

Although the cases cited by the parties set forth some general principles on this subject, they do not appear to be closely analogous to the instant case. Hyosung relies on *NEC Electronics v. Cal Circuit Abco*, 810 F.2d 1506 (9th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987), which does state the general rule that the unauthorized sale of genuine goods does not violate § 43(a). The decision of the court in *NEC* to deny relief, however, hinged upon the fact that the plaintiff was a wholly-owned subsidiary of the Japanese manufacturer, a situation to which there is no parallel in the instant case. Shonac principally relies upon *El Greco Leather Products Company v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987) for the proposition that the unauthorized sale of genuine goods is actionable under the Lanham Act. In *El Greco*, the court of appeals found to be erroneous the district court's conclusion that cancelled lots of shoes were genuine on the basis that the plaintiff, a trademark owner, was denied its contractually guaranteed right to inspect the goods before they were sold. Here, Shonac is not a trademark holder and thus does not have the interest a trademark owner would have in

protecting its name by reserving the right to inspect the goods.

The general rule on this issue has been succinctly stated as follows:

Section 43(a) does not cover disputes between parties concerning genuine goods unless, as part of the case, there is a showing of likelihood of confusion or a demonstration that the goods failed to meet the trademark owner's standards of quality.

McKenny & Long, *Federal Unfair Competition: Lanham Act § 43(a)* § 2.02[5] at 2–8 (1990); *accord H.L. Hayden Company of New York v. Siemens Medical Systems*, 879 F.2d 1005, 1023 (2d Cir.1989) ("[T]he unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation."). In the instant case, there is no evidence that consumers were confused or that the shoes failed to meet the trademark owners' standards of quality. Nevertheless, while Shonac's evidence on this issue is seriously deficient, the Court is not prepared to rule that Shonac has failed to create a genuine issue of material fact. However, the Court holds that as a matter of law, the unauthorized sale of genuine goods does not, without more, constitute a violation of § 43(a) of the Lanham Act.

**B. *RICO***

In Count Two of the third amended complaint, Shonac asserts RICO claims under 18 U.S.C. § 1962(a), (b), (c) and (d). Shonac concedes that Hyosung is entitled to judgment in its favor on the claims brought under 18 U.S.C. § 1962(a) and (b). Shonac's memorandum contra, p. 35.

18 U.S.C. § 1962(c) states as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Thus, the elements of a claim under § 1962(c) are "(1) conduct (2) of an enter-

prise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Conduct "simply means the performance of activities necessary or helpful to the operation of the enterprise." *Bank of America National Trust and Savings Association v. Touche Ross & Company*, 782 F.2d 966, 970 (11th Cir.1986).

### 1. Enterprise

An enterprise is defined in 18 U.S.C. § 1961(4), which states:

> "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

In *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987), the court identified three characteristics required for a RICO enterprise, as follows:

> First, there must be a common or shared purpose that animates the individuals associated with it. Second, it must be an "ongoing organization" whose members "function as a continuing unit," [*United States v. Turkette*, 452 U.S. 576, 583 [101 S.Ct. 2524, 2528, 69 L.Ed.2d 246] (1981)] in other words, there must be some continuity of structure and personnel. Third, there must be an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. ... Proof of all three of these characteristics is necessary in order to avoid the danger of guilt by association that arises because RICO does not require a proof of a single agreement as in a conspiracy case, and in order to ensure that criminal enterprises, which are RICO's target, are distinguished from individuals who associate for the commission of sporadic crime.

*Id.* at 855. "Continuity of structure exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *Id.* at 856.

■ In its third amended complaint, Shonac alleged that AMKO was the enter-

prise. However, an entity cannot at the same time be both a RICO defendant and a RICO enterprise. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1489 (6th Cir.1989). Shonac has since conceded that there is no evidence that AMKO was an enterprise. Nevertheless, the Court has granted Shonac leave to amend its complaint with an allegation of an "enterprise in fact" among Hyosung, Red Line and AMKO.

■ Viewing the evidence in the light most favorable to Shonac, the Court concludes that Shonac has failed to produce any evidence that Hyosung was part of any RICO enterprise in fact. With respect to the first requirement of a RICO enterprise, Shonac has not produced any evidence that there was a common or shared purpose that animated Hyosung and the other alleged participants of the so-called enterprise. Shonac suggests that the common purpose was to induce Shonac to buy the shoes even though the sale of the shoes allegedly violated the trademark owners' rights. First, there is no evidence that Hyosung ever attempted to induce Shonac to buy anything. Moreover, there is no evidence from which to infer that Hyosung even had knowledge that any of the shoes were counterfeit or that they otherwise infringed on the rights of the trademark owners. Nothing in any of the commercial documents received and processed by Hyosung, or any of the communications between Hyosung and the other parties suggests that Hyosung had any such common purpose.

The second requirement for a RICO enterprise is that the defendant was part of an ongoing organization whose members function as a continuing unit. Although Shonac argues that demonstrating an informal structure is sufficient, it does not suggest what the informal organizational structure was in this case, let alone present evidence of the same. There is simply no evidence of any structure or system of authority for directing the affairs of a group of which Hyosung was part.

The third requirement for a RICO enterprise is the existence of an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. Here, Shonac alleges a pattern of racketeering activity based upon the defendants' participation in mail and wire fraud in furtherance of their alleged scheme. Of course, because this Court finds that there is no evidence of any organizational structure at all, the third requirement is not met. Nevertheless, even if Shonac had succeeded in demonstrating an organizational structure, it still could not satisfy the third requirement. Here, the alleged pattern of racketeering consists of the use of mail and wire to transmit information germane to conducting business. The only "structure" in this case is the business relations among the defendants, including Hyosung. This purported structure necessarily is inherent in the conduct of the alleged pattern of racketeering activity— the transmittal of standard commercial documents and related information. Thus, Shonac has failed to satisfy the requirement of an ascertainable structure distinct from the pattern of alleged racketeering activity.

Based on the foregoing, the Court concludes that Shonac has failed to produce any evidence that Hyosung was part of any RICO enterprise in fact. Hyosung therefore is entitled to judgment as a matter of law on Shonac's § 1962(c) claim.

2. Racketeering Activity

 Hyosung also argues that Shonac has failed to come forward with sufficient evidence of racketeering activities. In its third amended complaint, Shonac alleges that Hyosung participated in mail and wire fraud. With respect to the alleged mail fraud, Shonac asserts that Hyosung caused the mails to be used in furtherance of a scheme to defraud by delivering commercial invoices, packing lists, beneficiary statements and other documents it prepared to BancOhio pursuant to the letters of credit opened by Shonac, in violation of 18 U.S.C. § 1341. Although the documents were sent to BancOhio by a private

courier, Shonac contends that BancOhio in turn sent them to Shonac via U.S. Mail.

The elements of mail fraud are as follows:

(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts);

(2) involving a use of the mails; and

(3) for the purpose of executing the scheme or attempting to do so.

*United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir.1988). When a person knows that the use of the mails will follow in the ordinary course of business, or where the use of the mails can reasonably be foreseen, then he causes the mails to be used. *Id.* The defendant does not himself have to have directly put the letter in the mail. *Id.* Rather, it is sufficient if the defendant reasonably anticipated, or a reasonable person would have foreseen, the use of the mails. *Id.* The mailings need not themselves be false in order to further a scheme to defraud. *Id.* The defendant may be charged even where the mailings were innocent or even legally necessary. *Id.* "As long as mailing is prior to fruition of the fraudulent scheme, it 'will support a conviction even if it follows the defendant's fraudulent acts, or occurs after the schemers have obtained the victim's money or goods.' " *Id.* (quoting *United States v. Bonansinga*, 773 F.2d 166 (7th Cir.1985), *cert. denied*, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986)). "In sum, the 'mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.' " *Id.* (quoting *United States v. Silvano*, 812 F.2d 754, 760 (1st Cir.1987)).

 Shonac has produced no evidence from which a reasonable trier of fact could infer that Hyosung was involved in or devised any scheme to defraud Shonac. Specifically, there is no evidence to infer that Hyosung had knowledge that the shoes were counterfeit or that they otherwise infringed upon the trademark owner's rights. In fact, there is no evidence that Hyosung even knew that the shoes were branded. Furthermore, the meager evidence of communication between Hyosung

and the other defendants indicates only that Hyosung received and processed certain standard commercial documents in providing its services as an export window. None of the documents received or processed by Hyosung give any indication of a fraudulent scheme.

Moreover, there is no evidence that Hyosung made, or had knowledge of any fraudulent statements or misrepresentations that might form the basis of a scheme to defraud. For reasons that will be discussed more fully below in connection with Shonac's common law fraud claim, the Court concludes that none of Hyosung's communications with Shonac contained any false statements. Furthermore, there is no evidence from which a trier of fact could infer that Hyosung had any knowledge of the alleged false representations of the other defendants. That is, there is no evidence that Hyosung knew that Lee or anyone else represented to Shonac that the shoes were not counterfeit or that the sale of the shoes would not infringe upon the trademark owners' rights. For these reasons, Shonac has failed to produce sufficient evidence to establish the first element of mail fraud, namely, a scheme to defraud.[2]

Even if Shonac had succeeded in coming forward with evidence of a scheme, and even under the broad standards applied in mail fraud cases, the Court concludes that Shonac has nevertheless failed to demonstrate that the mailings from BancOhio to Shonac were "closely related to the scheme." *Oldfield,* 859 F.2d at 400. Viewing the evidence in the light most favorable to Shonac, the mailing of the documents to Shonac by BancOhio was, at most, only tangentially related to the alleged scheme.

*See United States v. Kent,* 608 F.2d 542, 546 (5th Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *United States v. Chason,* 451 F.2d 301, 303 (2d Cir.1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972). Here, the buyers from Shonac who initiated the transactions never even saw the documents sent by BancOhio. Cowart, the only person at Shonac who did see the documents, testified that when she received them, which was after Hyosung was paid, she merely filed them. There isn't even evidence to suggest that Hyosung should have known that BancOhio would mail the documents—such mailings certainly were not required and in any event do not appear to have assisted in the completion of the transactions in any way. The Court concludes that Shonac has failed to produce any evidence to establish the third element of mail fraud.

Shonac also asserts in its memorandum contra that Hyosung committed wire fraud in violation of 18 U.S.C. § 1343. Specifically, Shonac contends that Hyosung delivered to it telex communications confirming the delivery dates of the footwear to a freight consolidator and that the telex communications referenced Shonac's purchase order numbers and the number of pairs of shoes ordered by Shonac. Shonac argues that because the purchase orders were mentioned, Hyosung impliedly incorporated by reference, and agreed to adhere to the terms and conditions of the purchase orders. Shonac, in effect, maintains that this implied promise in turn constitutes a fraudulent misrepresentation. However, Shonac has not presented any evidence that anyone at Hyosung ever saw any of the purchase

---

**2.** Shonac also argues that it has established the existence of a scheme to defraud based upon provisions of the Korean Foreign Trade Act that allegedly require exporters to inspect goods. Shonac's memorandum contra, pp. 39–40. Shonac does not argue that a violation of the Korean Foreign Trade Act would constitute a predicate act under RICO, and the Court fails to see how Korean law is probative of a scheme to defraud. Shonac first provided the Court with an English translation of the Korean Foreign Trade Act on December 5, 1990. Shonac does not mention the applicability of Korean law in

connection with any of its other claims in its third amended complaint, memorandum contra, or in any other written or oral argument made to the Court. The Court therefore concludes that Shonac has failed to afford the Court, Hyosung or the other defendants reasonable notice of an intention to raise an issue of foreign law with respect to its other claims as required under Fed.R.Civ.P. 44.1. *See Wachs v. Winter,* 569 F.Supp. 1438, 1443 (S.D.N.Y.1983) (failure to alert the court to the applicability of foreign law constitutes a waiver and an acquiescence to the application of the forum law).

orders. In fact, Shonac concedes on page 42 of its memorandum contra that copies of the purchase orders were never received by Hyosung. For reasons that will be discussed more fully below in connection with Shonac's common law fraud claim, the Court rejects Shonac's misrepresentation theory.

For the reasons discussed in connection with Shonac's allegation of mail fraud, the Court finds that Shonac has failed to come forward with sufficient evidence of wire fraud to avoid summary judgment. First, there is no evidence from which a reasonable trier of fact could infer that Hyosung had knowledge of or participated in any scheme to defraud. Furthermore, Shonac has failed to show how the alleged scheme's completion or the prevention of its detection depended in some way on the telexes. *See United States v. Pietri Giraldi*, 864 F.2d 222, 224 (1st Cir.1988). For these reasons, the Court concludes that Shonac has failed to come forward with sufficient evidence of racketeering activity to withstand Hyosung's motion for summary judgment.

### 3. Conspiracy

18 U.S.C. § 1962(d) states as follows:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

Having failed to come forward with sufficient evidence to support its claims under section 1962(a), (b) or (c), Shonac's section 1962(d) claim likewise fails. *See Craighead v. E.F. Hutton & Co., Inc.*, 899 F.2d 485, 495 (6th Cir.1990). Just as Shonac has failed to produce evidence of an enterprise, it has also failed to produce any evidence of a conspiracy in which Hyosung took part. The only communication between Hyosung and the other defendants consisted of the transmission of routine commercial documents. Nothing about the circumstances of this case gives any indication of a conspiracy. Interestingly, in arguing the existence of a conspiracy, Shonac observes in its memorandum contra, at page 57, that "these transactions, from all appearances, seemed to be legitimate purchases of branded athletic footwear. The communications, invoices, commercial documents, inspection certificates are part and parcel of usual and customary international, overseas transactions." Shonac seems to suggest that the very routine appearance of the subject transactions and documents is itself evidence of a conspiracy, or, presumably, an attempt to conceal one. The Court agrees that the transactions appear routine and normal, but finds that there is no evidence of a conspiracy.

Based on the foregoing the Court concludes that Hyosung is entitled to judgment as a matter of law on Count Two of Shonac's third amended complaint.

### C. *Breach of Warranty*

In Count Three of its third amended complaint, Shonac asserts claims of breach of warranty under Ohio Revised Code § 1302.25. Count Three of the third amended complaint concerns only the sale of "Awesome" shoes. Shonac concedes in its memorandum contra that Hyosung did not participate in any of the transactions involving Awesome shoes. Hyosung is therefore entitled to judgment as a matter of law on Count Three of Shonac's third amended complaint.

### D. *Common Law Fraud*

Shonac asserts a common law claim of fraud in Count Four of its third amended complaint. Hyosung argues that it is entitled to judgment as a matter of law on Count Four because Shonac has not come forward with any evidence of oral or written representations, or reliance.

The elements of fraud are as follows: (1) a false representation; (2) knowledge of the falsity on the part of the person making the representation; (3) intent to mislead others in relying upon the representation; (4) reliance with a right to do so, upon the misrepresentation by the party claiming injury; and (5) injury resulting from the reliance.

*Schwartz v. Capital Savings & Loan Company*, 56 Ohio App.2d 83, 381 N.E.2d 957, 959 (1978).

■ As was alluded to in connection with Shonac's RICO claims, Shonac asserts that Hyosung's fraudulent misrepresentations consist of Hyosung's references to Shonac's purchase order numbers in the documents Hyosung prepared pursuant to the letters of credit. By making these references, Shonac argues, Hyosung impliedly agreed to comply with all of the terms on the back of the purchase order, including the terms relating to title and trademark infringement. The back of each Shonac purchase order contains the following boilerplate language:

4. Acceptance of this Order shall constitute guarantee by the Seller that we are protected against all liability, loss or expense by reason of any patent or trademark litigation now existing, or hereafter began, arising out of any alleged infringement of patent, or trademark on the merchandise hereby ordered or any part thereof.

5. Acceptance of this Order shall constitute a warranty by the seller that the seller has title to and/or the absolute right to sell the goods ordered or shipped to Shonac.

(Rossler depo., Ex. 14). Thus, Shonac contends, Hyosung impliedly stated that the subject shoes were genuine and did not infringe upon the trademark owner's rights.

Shonac, however, concedes on pages 42–43 of its memorandum contra that copies of the purchase orders were not received by Hyosung. It would be absurd to conclude that Hyosung, by referencing purchase order numbers, incorporated terms of a document it had never seen. Shonac's argument is even more implausible when it is considered that there is no evidence that Hyosung even knew that the subject shoes were branded. In these circumstances, the Court holds that, as a matter of law, the mere reference in Hyosung's communications to Shonac's purchase order numbers does not constitute a false representation of fact concerning good title, genuineness, or the authorization of trademark owners.

Hyosung also contends that plaintiff is unable to prove the essential element of reliance. As Hyosung correctly points out, the deposition testimony of Shonac's buyers conclusively demonstrates that none of the buyers ever received any communication from Hyosung:

Q. Mr. Kelley, do you know if—do you know Hyosung Corporation? Does that name sound familiar?

A. Not—I don't know much about Hyosung.

. . . . .

Q. Did you ever have a telephone conversation with anyone at Hyosung?

A. No.

Q. Did you ever receive a fax transmission from anyone at Hyosung?

A. Me personally?

Q. You personally.

A. No.

Q. Do you know of any fax transmissions from Hyosung to Shonac Corporation?

A. I assume they were responsible for the commercial invoice.

Q. But however that got to Shonac, you have no knowledge of how that happened?

A. No, I do not.

Q. Did you personally ever receive any correspondence from Hyosung?

A. No, I didn't.

Q. Did you ever meet in person with anyone from Hyosung Corporation?

A. Not that I remember.

(Kelly Depo., pp. 221, 222–23). Shonac's other buyers involved in these transactions, Smith and Lipps, similarly testified that they never received any communication from Hyosung. (Smith Depo. pp. 156–58; Lipps Depo. pp. 106–07). Although Cowart may have received the documents prepared by Hyosung, there is no indication that she did anything but indicate in her computer that a shipment was received and then file the documents. (Cowart Depo. p. 86). No reliance is indicated. Based on the foregoing, the Court concludes that Hyosung is entitled to judgment as a matter of law on Count Four of Shonac's third amended complaint.

### E. Breach of Contract

 In Count Five of its third amended complaint, Shonac asserts a claim of breach of contract based upon the purchasing agent agreement between Shonac and AMKO. Shonac attempts to bring Hyosung into this claim by alleging that Hyosung conspired with and aided and abetted AMKO and Lee in the alleged breach of contract.

Hyosung argues that Ohio law does not recognize a cause of action for aiding and abetting a breach of contract. *See Pestel Milk Co. v. Model Dairy Products Co.*, 39 Ohio Law Abs. 197, 52 N.E.2d 651 (App. 1943); *Uihlein v. Cincinnati Car Co.*, 34 Ohio App. 52, 170 N.E. 178 (1929). Hyosung also contends that a person who is not a party to a contract will not be held liable for its breach on the ground that he allegedly conspired with the breaching party. *See Weinberg v. Schaller*, 34 Ohio App. 464, 171 N.E. 346 (1929).

Shonac argues that aiding and abetting a breach of contract is cognizable under Ohio law, as long as malice is alleged and proved. *See Weinberg v. Schaller*, 34 Ohio App. at 471, 171 N.E. at 349. The court in *Weinberg* stated:

> [I]f the petition be construed simply as charging a combination or conspiracy ... to injure the business ..., by producing a breach of contract ..., it wholly fails to state a cause of action within the law applicable to such class of cases, and, while the authorities are in some conflict as to how far courts will go in restraining parties outside a contract from interfering with the performance of the contract, it seems to be generally held by the better authority that malice is a necessary element, *and it must be alleged and proved* that there was an intentional doing of a wrongful act without legal justification or excuse.

*Id.* (emphasis added). Nevertheless, even if Ohio recognizes aiding or abetting as long as malice is "alleged and proved," Hyosung is still entitled to judgment in its favor as a matter of law. First, Shonac does not allege malice on Hyosung's part in Count Five of its third amended complaint, a requirement specifically mentioned in *Weinberg.*

 Second, Shonac has failed to produce any evidence that Hyosung conspired with or aided and abetted AMKO in the alleged breach of contract. The Fifth Edition of Black's Law Dictionary defines an aider and abettor as "one who assists another in the accomplishment of a common design or purpose; he must be aware of, and consent, to such design or purpose." Here, Shonac has failed to demonstrate that Hyosung had knowledge of the purchasing agent agreement or any of its terms or conditions. There is no evidence from which a reasonable trier of fact could infer that Hyosung shared a "common design or purpose" with AMKO to breach the contract. Furthermore, Shonac has not come forward with any evidence of malice. Although malice may sometimes be inferred from the facts and circumstances of a case, Shonac has not directed the Court's attention to any facts or circumstances in the instant case from which a reasonable trier of fact could infer malice. For the foregoing reasons, Hyosung is entitled to judgment as a matter of law on Count Five of Shonac's third amended complaint.

### F. Breach of Fiduciary Duties

Count Six of the third amended complaint is based upon AMKO's alleged breach of fiduciary duties. As in Count Five, Shonac asserts that Hyosung is liable for aiding and abetting the alleged breach. However, the Court dismissed Count Six against AMKO because Shonac failed to plead the claim with sufficient particularity. It follows that Hyosung is entitled to judgment as a matter of law on Count Six.

### G. Negligence

 In Count Seven of its third amended complaint, Shonac asserts that it is entitled to recover from Hyosung under a theory of negligence. Hyosung argues that there is no privity between Hyosung and Shonac, and that in the absence of privity, Ohio law does not recognize the right to recover for negligent infliction of purely economic harm.

In the absence of privity of contract between two disputing parties the general rule is "there is no ... duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things."

*Floor Craft Floor Covering, Inc. v. Parma Community General Hospital Association,* 54 Ohio St.3d 1, 3, 560 N.E.2d 206, 208 (1990) (quoting Prosser & Keeton, *Law of Torts* (5th ed. 1986) 657, Section 92). *See also Chemtrol Adhesives, Inc. v. American Manufacturers Mutual Insurance Co.,* 42 Ohio St.3d 40, 537 N.E.2d 624 (1989). In *Floor Craft,* the Ohio Supreme Court held that "in the absence of privity of contract no cause of action exists in tort to recover economic damages against design professionals involved in drafting plans and specifications." *Id.* (syllabus by the court).

Shonac argues that Ohio does recognize a cause of action for negligent infliction of economic harm in cases where the plaintiff is a member of a limited class. Shonac relies upon *Haddon View Investment Co. v. Coopers & Lybrand,* 70 Ohio St.2d 154, 436 N.E.2d 212 (1982). In *Haddon,* the court held that "an accountant may be held liable by a third party for professional negligence when that third party is a member of the limited class whose reliance on the accountant's representation is specifically foreseen." *Id.* (syllabus by the court). *See also* Restatement of Torts (Second) § 552. However, the court stated in *Floor Craft* that *Haddon View* was limited "to malpractice actions taken against accountants." *Floor Craft,* 54 Ohio St.3d at 4, 560 N.E.2d at 209.

Shonac, however, also relies on authorities which state that parties to a contract have the duty to perform under them

with care, skill, reasonable experience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort as well as a breach of the contract.

*Pipe Welding Supply Co. v. Gas Atmospheres, Inc.,* 201 F.Supp. 191, (N.D.Ohio 1961) (defective product case applying New York law). *See also Wagenheim v. Alexander Grant & Co.,* 19 Ohio App.3d 7, 482 N.E.2d 955, 965 (1983). Nevertheless, "ordinarily a breach of contract is not a tort." 70 O.Jur.3d Negligence § 18 at 60. Indeed, a tort is by definition a "private or civil wrong or injury, *other than breach of contract,* for which the court will provide a remedy." Black's Law Dictionary 1335 (5th ed. 1979) (emphasis added). This Court fails to see the utility of a rule that essentially turns a breach of contract into a cause of action for negligence. This Court doubts that the Ohio Supreme Court would deem this rule to be applicable to the instant case, but will assume, *arguendo,* that it would.

The Court will next examine the facts of this case in light of the foregoing authorities. The only allegation of privity Shonac raises in Count Seven of its third amended complaint is that Hyosung owed duties to Shonac "[a]s an agent." Third amended complaint, para. 82. In its memorandum contra, Shonac argues that Hyosung was the agent of either AMKO or Red Line, and therefore also a subagent of Shonac.

Ohio courts have looked to the Restatement of Agency in defining the agency relationship. *See e.g. Hanson v. Kynast,* 24 Ohio St.3d 171, 494 N.E.2d 1091, 1094 (1986). The Restatement (Second) of Agency §§ 12–14 lists three essential characteristics of an agency relationship, those being: the power of the agent to alter the legal relations between the principal and third parties; the fiduciary status of the agent with respect to matters within the scope of his agency; and the right of the principal to control the conduct of the agent with respect to matters entrusted to him.

Shonac has presented no evidence that Hyosung was authorized to act on behalf of Shonac, AMKO and Red Line to alter their legal relations with third parties. Likewise, Shonac has not produced any evidence that Shonac, AMKO or Hyosung had or exercised control over Hyosung's conduct. For these reasons, Shonac has failed to establish privity through agency.

In its third amended complaint, Shonac does not purport to rely upon any other relationship between the parties to assert its claim of negligence. In its memorandum contra, Shonac alludes, albeit obliquely, to Hyosung's role in the indirect sales transaction. The Court rejects any notion that this role gives rise to any of the duties Shonac seeks to enforce under the rubric of negligence. Even under the rule upon which Shonac relies, the parties to the contract have the duty to use reasonable care in performing *"the thing agreed to be done." Pipe Welding Supply,* 201 F.Supp. at 200 (emphasis added). Here, there is no evidence that Hyosung expressly or impliedly agreed to inspect the shoes or ensure that the trademark owner's permission to sell them had been secured. There is no evidence that Shonac or its alleged agents ever expected Hyosung to do anything other than what it did—act as an export window so that the shoes could be exported from Korea. In fact, the uncontroverted evidence shows that Shonac's salespersons, who initiated the transactions, were unaware of Hyosung's participation. Hence, there can hardly be said to have been a direct "meeting of the minds" between Shonac and Hyosung. There is also no evidence of the nature of the relationship between Hyosung, and Shonac's alleged agents, AMKO and Red Line. Whatever those relationships may have been, there is no evidence that the terms and conditions of the relationship included a duty on the part of Hyosung to inspect or obtain the permission of trademark owners. Indeed, that S.T. Kim independently and with Shonac's knowledge undertook to inspect the shoes suggests the opposite. The Court notes that the inspection certificates executed by S.T. Kim were included with the documents that were sent to Hyosung. In these circumstances, the Court finds that Shonac has failed to establish any evidence of an underlying contractual duty to support its negligence claim against Hyosung.

For the reasons stated above, Hyosung is entitled to judgment as a matter of law on Count seven of Shonac's third amended complaint.

## H. *Unjust Enrichment*

Shonac asserts a claim of unjust enrichment in Count Eight of its third amended complaint. Specifically, Shonac asserts that Hyosung was unjustly enriched by the receipt of commissions and by drawing against letters of credit paid by or opened by Shonac.

"Unjust enrichment occurs when a party retains money or benefits which in justice and equity belong to another." *Stan–Clean of Lexington, Inc. v. Stanley Steemer International, Inc.,* 2 Ohio App.3d 129, 440 N.E.2d 1237 (1981) (syllabus by the court, paragraph 2). "In the absence of fraud or bad faith, a person is not entitled to compensation on the ground of unjust enrichment if he received from the other what it was agreed between them the other should give in return." *Prudential Insurance Company v. Eslick,* 586 F.Supp. 763, 768 (S.D.Ohio 1984) (quoting *Ullmann v. May,* 147 Ohio St. 468, 72 N.E.2d 63 (1947) (syllabus by the court, paragraph 4)). "As ordinarily defined, the concept of unjust enrichment includes not only gain on one side but loss on the other, with a tie of causation between them." 18 O.Jur.3d *Contracts* § 343, p. 271.

The essence of unjust enrichment is the retention of some benefit by a person where it is in some way undeserved, and rightly belongs to another. Here, the only benefit Hyosung received was compensation for the services it performed as an export window. These services consisted of the processing of commercial documents. There is no evidence that Hyosung expressly or impliedly agreed to do anything else, such as inspect the shoes to ensure genuineness or obtain the permission of the trademark owners for the sale of the shoes. Rather, the sole purpose for Hyosung's involvement was to allow Shonac to export the shoes from Korea. Hyosung would never have been involved in the subject transactions if Korean law did not require goods to be exported through an export license holder. On the most fundamental level, there is no unjust enrichment in this case because Shonac received the benefit that corresponds exactly with the

payment Hyosung received—the shoes were exported from Korea. There is also no evidence of fraud or bad faith on Hyosung's part. *See Eslick*, 586 F.Supp. at 768.

In addition, the causal connection between Hyosung's gain and Shonac's loss is insufficient. Hyosung's gain was the compensation it received for the services it performed as an export window. Shonac's loss was having to pay license and royalty fees to the trademark owners. The causal connection between the two is simply too remote to establish unjust enrichment. Shonac cannot argue that but for Hyosung's involvement, the shoes could not have been exported because the shoes could have been exported through another export license holder. A sufficient causal connection may have existed, if, for example, in the absence of an enforceable contract Hyosung was paid for its services as an export window ahead of time, but failed to perform the services, requiring Shonac to incur expenses in finding an alternative means to export the shoes. This kind of causal connection is lacking in the instant case.

In passing, the Court notes that Shonac seemed to assert in both its third amended complaint and its memorandum in opposition that it was entitled to damages under its unjust enrichment claim in the amount of the value of the shoes. However, it is clear that even if Shonac's unjust enrichment claim was meritorious, its damages would be measured not by its own losses, but by Hyosung's gain. *See* Restatement of Restitution § 1 comment e.

For the foregoing reasons, Hyosung is entitled to judgment as a matter of law on Count Eight of Shonac's third amended complaint.

In summary, the Court finds that, even when the evidence is viewed in the light most favorable to Shonac, Hyosung was only tangentially involved in the subject transactions. In fact, Hyosung's involvement was only required because of a peculiarity of Korean law which requires that goods be exported through the holder of an export license. There is no evidence that

Hyosung had any reason to know that any of the shoes purchased by Shonac through AMKO were counterfeit or otherwise violated the rights of the trademark owners. The only evidence of communication between Hyosung and the other parties was in the form of standard commercial documents. Nothing in the documents, or the circumstances surrounding the transactions, suggests any scheme or agreement by Hyosung to defraud Shonac, and the documents prepared by Hyosung do not, as a matter of law, contain any representations about the genuineness of the shoes. Based on the foregoing, the Court holds that Hyosung is entitled to summary judgment on all of Shonac's claims.

It is so ORDERED.